GWENNIE M. WHITLATCH, Appellee, v. FANNIE E. BROWN et al., Appellants.

SPECIFIC PERFORMANCE: Evidence—Sufficiency.   Evidence reviewed, and held sufficient to justify a decree of specific performance.

*Appeal from Lucas District Court.*—D. M. ANDERSON, Judge.

WEDNESDAY, FEBRUARY 14, 1917.

SUIT for specific performance of an oral contract to convey by quitclaim deed an undivided one-seventh interest in a certain 120 acres of land situated in Lucas County. It is averred that the defendants received from the plaintiff the full consideration agreed upon for such conveyance. The defense is a specific denial that the defendants ever

agreed to convey the premises in question. There was a de-
cree for the plaintiff, and the defendants appeal.—*Affirmed.*

*Hickman & Wells,* for appellants.

*Wm. Collinson* and *J. A. Penick,* for appellee.

SPECIFIC PER-
FORMANCE: evi-
dence: suffi-
ciency.
EVANS, J. — The defendant Fannie
Brown is the daughter of the plaintiff. Her
co-defendant is her husband. The plaintiff
is the mother of seven children. She was formerly the exclu-
sive owner of the land in question, it being the farm home
upon which the family was reared. Prior to 1899 she was
a widow. At about that time she was married to Whitlatch.
Desiring to protect her children in case of her death before
that of her husband, she conveyed to them the fee title of
said land, reserving to herself a life estate; and her hus-
band joined in the conveyance. This was in 1904. The
farm was under an encumbrance of $1,600, which she sub-
sequently paid. In 1909, the plaintiff's husband died.
Thereafter, the mother desired to re-acquire the title, for the
purpose of re-arranging her affairs. Her plans included
a sale of the farm to her youngest daughter, with whom
she was making her home. In the meantime, a part of the
land had been taken for a railroad right of way, and the
condition of the title rendered negotiations difficult. Prior
to 1913, all her children had reconveyed the title to her
except the defendant daughter, who was then living in Wy-
oming. In November, 1913, the mother and her son went to
Wyoming to visit the daughter and to negotiate with her for
the reconveyance. It was at this time that it is claimed
that an oral agreement was reached. The evidence is not
very definite as to the terms of the agreement, and the record
is not free from confusion in some respects. Counsel for
appellants sum up the evidence from their point of view
as follows:

"The facts of this case as developed by the evidence, we claim, briefly stated, are as follows: Plaintiff and her first husband, the father of her children, including the defendant, Fannie Brown, were divorced, and some time thereafter, and prior to the marriage of plaintiff to her second husband, Mr. Whitlatch, the 120 acres of land in question was conveyed by the first husband, Mr. Long, to her. After the marriage to Mr. Whitlatch, on the advice of the first husband, the land was conveyed to the children by plaintiff, Mr. Whitlatch joining therein, reserving to herself a life estate therein. Plaintiff assisted her children financially, and particularly the defendant Mrs. Brown, to the extent of $300, loaned to take up a note signed by the defendant Richard Brown, and her son, Joe Long, at the Bank of Osceola, Iowa, about the time the defendant removed from Iowa to her present home in Divide, Wyoming. Also, she had, prior to that time, loaned Richard Brown in the neighborhood of $200. In regard to this indebtedness, it appears certain payments of interest were made and certain correspondence had by plaintiff, through her attorney, Wm. Collinson, of counsel in this case, who sent a new note to defendant for signature for the amount then due plaintiff, which note was not signed by defendant for the reason same was made payable on demand. Prior to November, 1913, plaintiff made her home with her youngest daughter, whose husband, Charles Coffman, farmed the land, plaintiff receiving her support therefrom, also from her various children, payments of interest upon the sums which she had furnished them respectively. About this time, the new railroad having been built through the county, and the coal fields in the locality of the farm being in prospect of immediate development, and the railroad demanding a right of way through the land, the sum of $2,700 was specified as damages from the railroad for the right of way

through the land, and plaintiff for some reason concluded to sell said land at $50 per acre, a price which defendants contend to be considerably less than its value, to the son-in-law, Coffman. Part of the right of way money to be applied in satisfaction of $1,600 mortgage then upon the land, the balance to be received by said Coffman, who would give to plaintiff a mortgage back upon the land for the remainder of the purchase price, about $4,300. To accomplish this purpose, plaintiff enlisted the assistance of her son, Joe Long, who went with her to the home of defendants near Divide, Wyoming, taking with her the notes before mentioned, and also a quitclaim deed to the land, to be executed by defendants. The deed was left by Joe Long with Richard Brown, and the two notes were delivered to the defendants, and at the time, the defendants signed a written acknowledgment or receipt for same, to the effect in substance that they were received as a part of the share of the defendant Fannie Brown in the estate, and also contained an agreement to pay interest upon the amount then due in the sum of $500, at the rate of five per cent, during the remainder of her lifetime, which interest defendant has paid and offered to pay plaintiff."

The nature of the consideration paid by the plaintiff was a surrender by her to the defendants of certain indebtedness owed by them to her. The circumstances attending such indebtedness were somewhat complicated. It appears that, two or three years prior to November, 1913, and shortly prior to the removal of the defendants to Wyoming, the plaintiff had advanced $200 at one time and $300 at another, at the request of the defendants, to pay certain notes due and owing from the defendants, or one of them. The defendants were to have executed a note to her for the money so received, but the note was never in fact executed. The plaintiff, however, had possession of the notes which had

been paid off with the money which she had loaned, and these appear to have been regarded by both parties as an evidence in her hands of the indebtedness to her. The amount actually due her, in November, 1913, with interest, was about $600. The agreement of November, 1913, as claimed in her behalf, was that she would surrender such notes and the indebtedness represented thereby, except that the defendants were to pay 5 per cent interest on $500 during the life of the plaintiff. A writing purporting to be a receipt from the daughter and her husband for the amount of the notes, together with an agreement to pay 5 per cent interest on $500, appears to have been signed on this occasion by the defendants. The paper itself is not in evidence, but its contents have been testified to on both sides.

There appears to be no dispute in the testimony that the plaintiff did, on the occasion in question, surrender to the daughter the principal sum of the indebtedness, subject to the payment of 5 per cent interest on $500, as above explained. The point of separation between the parties is that it is claimed for the plaintiff that, in consideration of this surrender, the defendant and her husband agreed to execute a quitclaim deed for the one-seventh interest of the farm. This is denied by the defendant and her husband, the claim being that the surrender of the principal was an unconditional gift, except that it was intended as an advancement out of the estate. Such is the conflict in the direct testimony at this point, and the circumstances surrounding the parties must be looked into for the corroboration of one side or the other. It is the contention for the plaintiff that the reason the deed was not signed at the time of the agreement was that a trip of 25 miles to Cheyenne would be necessary for the purpose of acknowledgment, and the daughter was not able to go at that time. It is proved beyond question that the plaintiff and her son

took out with them a proposed deed already prepared, and that this was left with the defendants, together with the surrendered notes. The defendants promised, as contended for plaintiff, that they would go to Cheyenne on some pleasant day and execute the deed before a notary, and send the same to the mother. In corroboration·of this claim, it appears that, in December, the defendant daughter wrote a letter to the mother, to which was added the following postscript: "Wish you a Happy New Year. It may be some time before we can go to Cheyenne, due to the condition of the roads." On December 11th, the plaintiff's son, Joe, who had gone with her to the defendant's home and conducted the negotiations, wrote a letter on the subject to his sister, the defendant, urging her to send the deed as soon as possible. His letter to her was entirely consistent with the present contention for the plaintiff. No reply was made by the defendant to this letter. In the latter part of the winter, the attorney for the plaintiff wrote to the defendant on behalf of the plaintiff, asking for the sending of the deed. To this letter the defendant replied with a refusal, stating that "things had been misrepresented" to her.

The claim on behalf of the defendant, that the only agreement reached between herself and her mother and her brother was that her mother made her a gift of the sums owed to her, does not impress us as reasonable or probable, under the conceded circumstances surrounding the parties. The trip was taken to the home of the defendant for the very purpose of obtaining an execution of the deed. The defendant had previously refused to execute it as a matter of grace or for a nominal consideration. Her refusal alone stood in the way of the control of the title by the plaintiff. The consideration finally offered her was not inadequate in value. If she had continued in her refusal

to convey back to her mother for such consideration, it is not easily credible that the mother would, under such circumstances, then release the existing indebtedness. Considerations of justice to the other children would weigh against such a course.

It is urged for the defendants that there is no evidence that both husband and wife at any time agreed to the same thing. It appears that the negotiations on behalf of the mother were conducted mainly by her son. Much of his talk was with his sister alone, and it was with her alone that the real agreement was first reached. There was more or less talk with the husband, and he was undoubtedly informed of the agreement with the wife. He himself testified as a witness that he had agreed that he would do whatever his wife did.

We think that the circumstances here indicated quite strongly corroborate the testimony for the plaintiff. None of the circumstances furnish corroboration to the defendants. The trial court found for the plaintiff, and we think its decree should be—*Affirmed.*

GAYNOR, C. J., LADD and SALINGER, JJ., concur.